IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 21, 2018 Session

IN RE AMYNN K.

Appeal from the Juvenile Court for Hamilton County
No. 273258   Robert D. Philyaw, Judge

_____

No. E2017-01866-COA-R3-PT

_____

This is a termination of parental rights case involving the parental rights of the father, William K. ("Father"), to his minor child, Amynn K. ("the Child"), who was four years of age at the time of trial.  The Child was born in 2013 to Father and Amanda S. ("Mother").  In April 2013, the Hamilton County Juvenile Court ("trial court") granted temporary legal custody of the Child to the Tennessee Department of Children's Services ("DCS").  The Child was immediately placed in foster care, where he has remained since that date.  Following a hearing, the trial court entered an order on June 24, 2013, adjudicating the Child dependent and neglected due to Mother's abandonment of the Child at the hospital following his birth.  On August 23, 2016, DCS filed a petition to terminate the parental rights of Mother and Father.  Following a bench trial, the trial court terminated Father's parental rights to the Child upon determining by clear and convincing evidence that Father had (1) abandoned the Child through conduct exhibiting wanton disregard for the welfare of the Child prior to Father's incarceration, (2) failed to substantially comply with the requirements of the permanency plans, and (3) failed to manifest an ability and willingness to personally assume custody of and financial responsibility for the Child.  The court also found clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child.  Father has appealed.[1]  Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

---

[1] The trial court also terminated Mother's parental rights to the Child.  Mother did not appeal the decision of the trial court and is not participating in this appeal.  We will therefore confine our analysis to those facts relevant to Father.

Emily Brenyas, Chattanooga, Tennessee, for the appellant, William K.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Cara Welsh, Chattanooga, Tennessee, Guardian Ad Litem.[2]

**OPINION**

I.  Factual and Procedural Background

On August 23, 2016, DCS filed a petition seeking to terminate Mother's and Father's parental rights to the Child.  The Child had been taken into protective custody by DCS in April 2013, when he was two days old, at the hospital where he was born. According to the trial court's factual findings in the dependency and neglect adjudicatory hearing order, Mother expressed a desire upon the Child's birth to place him for adoption. Although Mother briefly changed her mind, she decided by the time of removal that she was not able to care for the Child.  Father came to the hospital when the Child was born but was escorted from the property by hospital security because, according to Father, Mother had stated that she did not want him to be present.  Following the Child's birth, Mother declared that Father was the biological father of the Child.  However, Father's name does not appear on the birth certificate, and Father did not sign a Voluntary Acknowledgment of Paternity.  When the Child was four days old, he was placed with the foster parents, with whom he remained at the time of trial.

As part of a dependency and neglect action filed by DCS in the trial court, Father and Mother appeared during a preliminary hearing conducted on May 8, 2013, and an adjudicatory hearing conducted on June 24, 2013.  Throughout those proceedings, Mother maintained that she did not wish to have visitation with the Child, and the trial court adjudicated the Child dependent and neglected based on Mother's abandonment. Father had first expressed a desire to obtain custody of the Child when he participated via telephone in a child and family team meeting conducted by DCS nearly two weeks following the Child's birth, and he continued to express this desire during the dependency and neglect proceedings.  Following the adjudicatory hearing, the trial court scheduled a hearing to begin the process of establishing Father's legal paternity.

---

[2] Ms. Welsh participated in oral arguments but did not file a brief in this matter.  Therefore, any issues raised by Ms. Welsh in oral argument that were not otherwise raised by the parties are not properly before this Court.

While the Child was in DCS custody, Father entered into four permanency plans with DCS. The first plan was developed on April 23, 2013; ratified by the trial court on July 31, 2013; and presented as an exhibit during the termination trial. As to Father, this plan set forth the following responsibilities, which were approved by the trial court as reasonably related to remedying the conditions which necessitated foster care: (1) Father would submit to a DNA test to determine whether he was the biological father of the Child; (2) if the DNA test proved that Father was the biological father of the Child, he would file a petition for custody of the Child; (3) Father would obtain and maintain stable housing and legal, verifiable income; (4) Father would sign releases to allow DCS to obtain information; (5) Father would maintain contact with DCS; and (6) Father would pay child support. It is undisputed that DCS provided Father with a copy of the Criteria and Procedures for Termination of Parental Rights and that he acknowledged his receipt of the form through his signature. A DCS Family Services Worker also signed the form, acknowledging that she had explained the contents of the document to Father.

Father subsequently submitted to DNA testing, the results of which were not yet complete when he participated in the development of a second permanency plan with DCS. The second permanency plan was developed during a child and family team meeting held on September 17, 2013. The plan was approved by the trial court on October 23, 2013, and presented as an exhibit during the termination trial. The second permanency plan repeated Father's responsibilities from the first plan of establishing paternity, filing for custody, establishing and maintaining stable housing and verifiable income, signing releases for DCS, maintaining contact with DCS, and paying child support. It also set forth the following additional responsibilities, again approved by the trial court as reasonably related to remedying the conditions necessitating foster care: Father would (1) complete a mental health assessment and follow all recommendations therefrom, (2) complete an alcohol and drug assessment and follow all resultant recommendations, (3) complete parenting classes, and (4) submit to random drug screens.

The record reflects that DNA testing ultimately demonstrated that Father was the biological father of the Child. Based on the DNA test results, Father was declared to be the biological and legal father of the Child by the Hamilton County child support court on September 23, 2013. At that time, the child support court set Father's initial child support obligation at $259.00 monthly but subsequently modified that amount to $124.00 monthly in October 2014.

Following a permanency hearing conducted on July 9, 2014, the trial court found that Father was "in substantial compliance" with the second permanency plan. However, the court found that remaining barriers to Father's reunification with the Child included "developing a support system to care for the child when he was at work" and "addressing safety concerns at his home to make it safe for the child to be placed there." At the time, Father resided in Montgomery County.

- 3 -

During a review hearing conducted on October 15, 2014, DCS reported that Father had completed a clinical parenting assessment and an alcohol and drug assessment and that he was enjoying unsupervised visitation with the Child. Although the recommendations of the parenting assessment included anger management classes, DCS also announced that Father would soon be able to begin overnight visitation with the Child. However, following an unannounced home visit conducted by former DCS family services worker Kalia Williams in November 2014, new concerns arose regarding environmental conditions in Father's home and the presence of Father's mother ("Paternal Grandmother") and sister-in-law, both of whom Montgomery County DCS had previously indicated "for issues related to sexual exploitation of minor children." Father testified during trial that Paternal Grandmother had vacated Father's home following this home visit. Notwithstanding, DCS alleged and the trial court found that Paternal Grandmother kept a key and "appeared to have unfettered access to [Father's] home." Upon DCS's motion, the trial court entered an order directing that Father's unsupervised overnight visits would take place in Hamilton County, where the Child remained in foster care, rather than in Montgomery County where Father resided.

DCS subsequently developed a third permanency plan with Father's participation on February 20, 2015. The third plan was approved by the trial court on May 20, 2015, and was presented as an exhibit during the termination trial. This plan required Father to comply with the aforementioned requirements from the previous permanency plan and included an additional responsibility that Father would participate in anger management classes as recommended by his clinical assessment, which responsibility was found by the trial court to be reasonably related to remedying the conditions necessitating foster care.

DCS does not dispute Father's assertion that he completed the requirements for anger management classes, parenting education classes, and random drug screens. Although Father's tobacco use and the resulting environmental issue of cigarette butts and cigar tips in the home and yard appear to have been concerns, the only allegation of drug abuse against Father originated with Mother when the Child was first placed in custody. DCS acknowledged that this allegation was ultimately unsubstantiated. However, during a home visit to Father's residence on September 17, 2015, Ms. Williams observed additional environmental concerns, testifying during trial that the home was not a safe and appropriate environment for the child at that time. According to the trial court's order, Ms. Williams testified that she personally observed during this visit:

> a refrigerator on the porch, a padlock on the front door, safety issues related to a hole or gap at the front porch entrance, the flooring needed to be repaired, the home was cluttered with big totes stacked on top of one another, including tools, and the bathroom floor was unfinished.

Father enjoyed what would be his only unsupervised overnight visit with the Child on October 19 and 20, 2015. As Father acknowledges on appeal, he "was late to pick the child up, brought an unapproved adult around the child, and returned the child to the Foster Parents' home late." The unapproved adult was a woman, A.D., whom Father had initially met online and had not met in person until the date of the overnight visit. Father does not dispute the trial court's summary in its final order of Ms. Williams's testimony regarding this incident. The court stated as follows in relevant part:

> Ms. Williams testified that after the visit, it was discovered that [A.D.] had been arrested in Georgia on October 8, 2015 for aggravated assault (family violence). Ms. Williams testified that during his visit, [Father] took the subject child over the state line and into Georgia to spend time with [A.D.]. It was also discovered that [Father's] license was not reinstated and he was driving without a valid driver's license.

Father does not dispute that DCS had informed him in advance that he was not to have unapproved adults around the Child during unsupervised visitation. As a result of the problems with the overnight visit, DCS suspended Father's unsupervised visitation.

DCS developed the fourth permanency plan during a child and family team meeting held on October 26, 2015, at which Father was not present but for which he preapproved his counsel's attendance and decision-making on his behalf. Father does not dispute that he received a copy of the fourth permanency plan and corresponding statement of responsibilities via United States mail. This plan was ratified by the trial court on December 23, 2015, and was presented as an exhibit at trial. It included Father's requirements included in the previous permanency plans and further delineated the following responsibilities for Father, approved by the trial court as reasonably related to remedying the conditions necessitating foster care: Father would (1) provide and maintain a safe, stable home for the Child; (2) "meet all of [the Child's] needs and ensure that he grows and thrives as he should"; (3) child proof his home to ensure that the Child was safe from environmental harm; (4) ensure that the Child had adult supervision at all times when the Child was in his care; (5) obtain and maintain a driver's license and vehicle insurance prior to any unsupervised visits; and (6) complete specific housing corrections, to include enclosing the water heater outside of the Child's bedroom, fixing the floor in the bathroom, adding cabinet faces in the kitchen, fixing the space/opening between the front door and front porch, picking up all cigar tips from the yard, and installing a container in the front yard in which to place the tips in the future.

DCS acknowledges that Father completed some of the tasks set forth in the fourth permanency plan. As to the ongoing requirement of maintaining verifiable employment, DCS acknowledges that Father had been employed with Auction World and "had a

steady job until April 2016." Father was terminated from his employment in April 2016 after he was arrested for aggravated assault. Subsequently, he was employed in a seasonal job at a distribution center from October 31, 2016, until November 26 or 27, 2016. After November 2016, Father was unemployed and remained so until his arrest on January 3, 2017. Following Father's release from jail on February 25 or 26, 2017, he remained unemployed at the time of trial in May 2017.

As the trial court in its final order summarized Ms. Williams's testimony regarding Father's progress on the permanency plan:

> [Father] completed parenting classes and anger management through the in-home services that Ms. Williams had arranged for [Father] to receive in Montgomery County.[3] Further, the in-home service worker incorporated the recommendations from the clinical parenting assessment. When Ms. Williams made another visit to [Father's] home, she observed that he had picked up the cigar tips in his yard, that he had completed the flooring in the living room and was working on the flooring in the bathroom, and that he was working on the cabinets. She testified that what she had believed was a water heater was not actually a water heater and did not get hot. Therefore, that was no longer a safety concern.

Ms. Williams also testified, however, that barriers to permanency continued to exist because Father was inconsistent in his visitation with the Child, failed to maintain adequate contact with DCS, failed to maintain stable employment, and incurred criminal charges of arson in October 2013 and driving on a suspended or revoked license and violation of probation in August 2015.

Janelle Holland, a DCS Family Services Worker who assumed responsibility over the case in May 2016, testified that since she had been working with Father, he had changed residences and failed to supply documentation of his latest residence. Father does not dispute his admission to Ms. Holland that he had waited months to provide DCS with his change of address because he did not want DCS to perform a home study. Father acknowledged that he had fallen behind on his child support obligation and that a contempt action was pending against him. Father also testified that he had purchased shoes for the Child and sometimes brought items for the Child to his visits with the Child. According to Ms. Holland, Father had not paid child support since April 2015 and, at the time of trial, owed a $4,000.00 child support arrearage.

---

[3] In the parenting assessment, presented as an exhibit during trial, the evaluator determined Father's intelligence quotient to be "within the borderline range of intellectual functioning" and recommended that Father receive parenting education through in-home services rather than in a classroom.

On appeal, Father does not dispute the trial court's findings in its final order regarding the basic facts underlying his criminal charges and incarceration while the Child was in DCS custody. The court found in pertinent part:

On July 2, 2013, [Father] was charged with arson in Montgomery County. On or about November 21, 2013, [Father] was placed on probation and qualified for diversion on the arson offense, but later violated the terms of his diversion agreement and was subsequently convicted of that offense. On August 12, 2015, [Father] was arrested for driving on a suspended or revoked license, to which he later entered a guilty plea. On March 4, 2016, [Father] was arrested for driving on a revoked or suspended license and for having prohibited weapons — brass knuckles. [Father] testified that the brass knuckles in the car were not his, but he admitted that he was convicted for it. On April 4, 2016, [Father] was arrested on two (2) counts of aggravated assault and violation of probation, which he later admitted pleading guilty to.

Following Father's arrest in April 2016, DCS developed a fifth permanency plan on April 29, 2016. During a permanency hearing, the trial court granted a continuance concerning potential approval of this plan upon requests made by Father's counsel and the guardian *ad litem* to review the plan. In a permanency hearing order entered on June 8, 2016, the trial court found that specific barriers still existing to Father's reunification with the Child were the inconsistency of Father's visitation with the Child, his failure to pay child support, his lack of a driver's license, and his unresolved legal issues. The fifth permanency plan was not submitted to the trial court for approval prior to the termination trial or entered as an exhibit during trial. However, following a permanency hearing conducted on July 13, 2016, the trial court found that Father was no longer in compliance with the previous permanency plans. Noting that Father had reported that he had been arrested for aggravated assault and evicted from his home, the court recommended that DCS proceed with filing a petition to terminate parental rights.

On August 23, 2016, DCS filed a petition to terminate the parental rights of Father and Mother. DCS amended the petition on February 21, 2017, to include the statutory ground of abandonment by an incarcerated parent through wanton disregard. Following a bench trial conducted over the course of two nonconsecutive days on May 1, 2017, and May 25, 2017, the trial court found that grounds existed to terminate the parental rights of both parents. As to Father, the court found, by clear and convincing evidence, that Father had (1) abandoned the Child through conduct exhibiting wanton disregard for the Child prior to Father's incarceration, (2) failed to substantially comply with the reasonable responsibilities of the permanency plans despite reasonable efforts made by DCS, and (3) failed to manifest an ability and willingness to personally assume custody of and

financial responsibility for the Child.[4] *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(iv) & 36-1-113(g)(1) (abandonment through wanton disregard prior to incarceration), -113(g)(2) (substantial noncompliance with permanency plans), -113(g)(14) (failure to assume custody or financial responsibility). The court further found, by clear and convincing evidence, that termination of Father's parental rights was in the best interest of the Child. Father timely appealed.

## II. Issues Presented

Father raises three issues for our review, which we have restated slightly:

1. Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Father's abandonment of the Child based on Father's conduct exhibiting wanton disregard for the Child's welfare prior to Father's incarceration.

2. Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Father's substantial noncompliance with the permanency plans and by finding that the requirements of the permanency plans were reasonably related to remedying the conditions necessitating foster care.

3. Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Father's failure to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child.

DCS raises an additional issue for our review, which we have restated slightly:

4. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record,

---

[4] Prior to the trial, DCS nonsuited the statutory ground of abandonment by failure to financially support the Child.

accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re*

*Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

### IV. Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)   The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)   Termination of parental or guardianship rights must be based upon:

(1)   A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)   That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Father's parental rights: (1) abandonment through

conduct exhibiting wanton disregard for the Child's welfare prior to Father's incarceration, (2) substantial noncompliance with the permanency plans, and (3) failure to manifest an ability and willingness to assume custody of or financial responsibility for the Child. We will address each statutory ground in turn.

## A. Abandonment Through Wanton Disregard

Father contends that the trial court erred by finding that DCS had proven by clear and convincing evidence that he had abandoned the Child through his actions prior to incarceration that allegedly constituted wanton disregard for the Child's welfare. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2017). Upon a thorough review of the record, we disagree.

Tennessee Code Annotated § 36-1-113(g)(4), as relevant to this issue, provides:

(g)      Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

        (1)      Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A)(iv) provides in pertinent part:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

(Emphasis added.)

A parent's actions constituting wanton disregard for the welfare of a child are not restricted to solely the four-month period prior to incarceration. *See In re Audrey S.,* 182 S.W.3d at 871. This Court has consistently held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68; *see also In re K.F.R.T.,* No. E2015-01459-COA-R3-PT, 2016 WL 908926, at *4 (Tenn. Ct. App.

Mar. 10, 2016). "Simply stated, a parent's 'poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children.'" *In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (quoting *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)).

The Child was born in April 2013. Only months following the Child's birth, Father was arrested in July 2013 on a charge of arson in Montgomery County. Father was placed on probation concerning the arson charge and qualified for judicial diversion. Father subsequently violated the terms of his diversion agreement and was convicted of the arson charge. Father also violated the terms of his probation when he was arrested on March 4, 2016, and charged with driving on a suspended license and possession of a prohibited weapon, specifically brass knuckles. Although Father denied that the brass knuckles were his, he pled guilty to the weapon possession offense and to violation of his probation. On April 4, 2016, Father was arrested on two counts of aggravated assault and violation of probation, to which he subsequently pled guilty. All of Father's aforementioned convictions occurred after the Child's birth and while Father was aware of his responsibility to maintain a safe, stable home for the Child.

Furthermore, DCS also presented proof that Father had not consistently financially supported the Child, and the trial court found that Father had not paid child support since April 2015. The failure to provide adequate financial support for a child is another type of conduct that can exhibit wanton disregard for the welfare of a child. *See In re Audrey S.,* 182 S.W.3d at 867-68. We conclude that the evidence regarding Father's behavior prior to his incarceration, including his criminal activity and failure to financially support the Child, corroborates the trial court's finding that the statutory ground of abandonment through wanton disregard was proven by clear and convincing evidence.

B. Substantial Noncompliance with the Permanency Plans

Father contends that the trial court erred by finding clear and convincing evidence that he failed to substantially comply with the reasonable responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as a ground for termination of parental rights:

(2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In the present case, the trial court approved four permanency plans throughout the four years that the Child was in DCS custody. The first permanency plan, which was developed on April 23, 2013, provided the following responsibilities regarding Father:

(1) Father would submit to a DNA test to determine whether he was the biological father of the Child; (2) if the DNA test proved that Father was the biological father of the Child, he would file a petition for custody of the Child; (3) Father would obtain and maintain stable housing and a legal, verifiable income; (4) Father would sign releases to allow DCS to obtain information; (5) Father would maintain contact with DCS; and (6) Father would pay child support. The second permanency plan, developed on September 17, 2013, included the action steps from the previous permanency plan and added the following requirements: Father would (1) complete a mental health assessment and follow all recommendations therefrom, (2) complete an alcohol and drug assessment and follow all resultant recommendations, (3) complete parenting classes, and (4) submit to random drug screens. On February 20, 2015, Father participated in the development of a third permanency plan, which required Father to comply with the requirements from the previous plans and was modified to include the anger management recommendation from Father's mental health assessment.

The fourth permanency plan was developed on October 26, 2015. Father did not attend the child and family team meeting wherein the plan was developed but approved his counsel's representation of Father's interest. This plan listed the following requirements that Father would: (1) provide and maintain a safe, stable home for the Child; (2) "meet all of [the Child's] needs and ensure that he grows and thrives as he should"; (3) child proof his home to ensure the Child was safe from environmental harm; (4) ensure the Child had adult supervision at all times when the Child was in his care; (5) obtain and maintain a driver's license and vehicle insurance prior to any unsupervised visits; and (6) complete specific housing corrections, to include enclosing the water heater outside of the Child's bedroom, fixing the floor in the bathroom, adding cabinet faces in the kitchen, fixing the space/opening between the front door and front porch, picking up all cigar tips from the yard, and having a container in the front yard in which to place the tips in the future.

Father participated in the development of three of the four permanency plans and authorized his attorney to attend the fourth meeting in his stead.[5] Father signed the first three permanency plans. Father does not dispute that he was provided with a copy of the fourth permanency plan via United States mail. The trial court determined that the permanency plans were in the best interest of the Child and that Father's requirements in the permanency plans were reasonably related to the reasons necessitating foster care. *See In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) ("A trial court must find that the requirements of a permanency plan are 'reasonable and related to remedying the conditions which necessitate foster care placement.'" (quoting Tenn. Code Ann. § 37-2-

---

[5] Additional action steps for Father were added in a fifth permanency plan, but we are unable to determine whether Father complied with that plan because that plan was not admitted into evidence.

403 (2017)). Father argues on appeal that "[t]he sole reason this child came into foster care was abandonment by the mother" and that the permanency plan requirements "had no relationship to the reason for custody." Father averred that no allegations existed "at the time of removal other than that [DCS] did not know where Father was." Our Supreme Court has previously held that the "[c]onditions necessitating foster care placement may include conditions related both to the child's removal <u>and to family reunification</u>." *In re Valentine*, 79 S.W.3d at 547 (emphasis added). Father's inability to prove a safe, stable home for the Child and his continued criminal behavior were continuous concerns for the trial court when considering reunification. Upon a thorough review of the record, we determine that the evidence in the record supports the trial court's finding that the permanency plan requirements were reasonably related to remedying the conditions that necessitated foster care.

The trial court further determined that Father had not substantially complied with the responsibilities and requirements set out in the permanency plans. Specifically, the trial court found that Father had not maintained safe and stable housing; had not obtained his driver's license or vehicular insurance; and had not provided proof of legal, verifiable income. Upon our careful review of the record, we determine that the evidence preponderates in favor of the factual findings made by the trial court.

DCS does not dispute that Father submitted to a DNA test; completed a mental health assessment, parenting classes, and anger management classes; and made several repairs to his home. However, the requirement that Father provide a safe, stable home has been a consistent requirement throughout the four permanency plans approved by the trial court. At the beginning of the Child's tenure in DCS custody, Father lived with Paternal Grandmother, whom DCS would not approve to have contact with the Child. The trial court recognized that Paternal Grandmother had been indicated by DCS for sexual exploitation of a minor. Although Paternal Grandmother moved out of Father's home, the trial court found that Paternal Grandmother possessed a key and "unfettered access" to Father's home. The fourth permanency plan addressed several repairs that Father needed to make to ensure that his home was safe for the Child. We recognize that Father did complete several of the requested repairs in his home to make it physically safe for the Child.

Father subsequently moved to another residence where he reportedly resided for one or two years. According to Father, he "got in some trouble" at that residence and moved. Thereafter, he moved in with a member of his support team and lived there from June 2016 until December 2016. Father relocated to another residence in December 2016 where he continued to reside at the time of trial. We note that after Father changed residences, he admittedly chose not to inform DCS of his new address because he did not want DCS to complete a home study of that residence. Although Father informed the participants in a foster care review board in January 2017 that he had moved, he did not

- 14 -

provide an address. Father did not provide an address to Ms. Holland until March 2017 when he informed her that he had been residing at the new address since December 2016. After learning Father's new address, Ms. Holland requested that Father provide her with a copy of his lease before the home study was to be completed to ensure that Father actually resided in the home. Father testified that he had a lease to his residence, but according to Ms. Holland, he never provided a copy of the lease document to DCS. Therefore, Father never demonstrated that he could provide a safe, stable home for the Child.

Father's driver's license was revoked during the pendency of the dependency and neglect action. Included in the respective permanency plan was a requirement that Father obtain reinstatement of his driver's license prior to any unsupervised visitation. At the time of trial, Father testified that he was in the process of reinstating his driver's license but admittedly had not obtained reinstatement as of the date of trial. Additionally, we note that Father participated in an overnight, unsupervised visit with the Child on October 19 and 20, 2015; that he had driven the Child to and from the foster home for the visit; and that the trial court found that he was driving without a valid driver's license on that date.

As an additional responsibility of his permanency plans, Father was required to maintain legal and verifiable income with which to financially support the Child. Father maintained stable employment until April 2016 when he was charged with two counts of aggravated assault. Father lost his employment due to his arrest. Father was subsequently employed for approximately one month from October to November 2016. According to Father, he lost that job when he left work to attend a funeral. Father was not employed prior to his incarceration in January 2017 and had not obtained employment following his release in February 2017. Father remained unemployed at the time of trial. Father testified that his father and Paternal Grandmother were assisting him in paying the expenses related to his residence. Furthermore, Father failed to consistently pay child support for the Child even when he maintained stable employment. At the time of trial, Father had not paid child support since April 2015.

The trial court further found that throughout the time Father enjoyed unsupervised visitation, "he was inconsistent and failed to maintain adequate contact with [DCS]." We note that Father did make efforts to improve his physical home to make it safer for the Child and completed a mental health assessment, parenting classes, and anger management classes. However, Father's criminal behavior escalated during the pendency of the case, ultimately leading to Father's loss of employment in April 2016. Father thereafter continued without a legal, verifiable source of income on the date of trial except for approximately one month in October and November 2016. Father's driver's license had been suspended or revoked since 2015, and it remained invalid on the date of trial. Most importantly, after four years, Father was unable to demonstrate that he could

provide a safe and stable home for the Child. Considering all of the relevant evidence in the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father failed to substantially comply with the requirements of the court-approved permanency plans.

### C. Failure to Manifest a Willingness and Ability to Assume Custody of or Financial Responsibility for the Child

Father argues that the trial court erred by relying upon Tennessee Code Annotated § 36-1-113(g)(14) (2017) as a statutory ground for terminating his parental rights. This subsection, which was added to the statutory framework effective July 1, 2016, *see* 2016 Tenn. Pub. Acts, Ch. 919 § 20 (S.B. 1393), provides as an additional ground for termination:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Upon our careful review of the record, we determine that the trial court did not err in finding clear and convincing evidence of this statutory ground.

We adhere to the following longstanding principles of statutory interpretation:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.,* 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable."

*Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga,* 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner,* 295 S.W.3d 610, 613-14 (Tenn. 2009).

This Court has recently explained the following with regard to this ground for termination of parental rights:

Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

\* \* \*

We have made the following observations about what constitutes "substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray,* 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

*In re Maya R.,* No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7-8 (Tenn. Ct. App. Apr. 4, 2018) (additional internal citations omitted).

- 17 -

We note at the outset of our analysis that an apparent split in authority exists in Tennessee regarding whether Tennessee Code Annotated § 36-1-113(g)(14) can be relied upon as a ground for termination of parental rights if a parent has solely manifested a willingness but has not manifested an ability to assume legal and physical custody or financial responsibility for the child. Tennessee Code Annotated § 36-1-113(g)(14) states that a parent's rights can be terminated if the parent has failed to manifest "<u>an ability and willingness</u> to personally assume legal and physical custody or financial responsibility of the child." (Emphasis added.) In the case of *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *7 (Tenn. Ct. App. May 23, 2018), this Court affirmed the termination of the father's parental rights based on the father's failure to manifest an <u>ability</u> to personally assume legal and physical custody of the children despite the father's <u>willingness</u> to assume legal and physical custody. However, in *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), another panel of this Court held that Tennessee Code Annotated § 36-1-113(g)(14) requires the petitioner to prove that the parent manifested <u>both</u> an unwillingness and an inability to assume legal and physical custody or financial responsibility for the child before this ground for termination may be utilized.

The *Ayden S.* Court determined that Tennessee Code Annotated § 36-1-113(g)(14) requires a "negative proof," as that term is defined in ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 120 (2012). *In re Ayden S.*, 2018 WL 2447044, at *7. Scalia and Garner present this definition as a type of sentence in which the conjunctive "and" or the disjunctive "or" may appear in legal writing, and they include it within a chapter entitled, "Semantic Canons," and a section entitled, "Conjunctive/Disjunctive Canon." SCALIA & GARNER, at 116-25. Scalia and Garner define "The Negative Proof" as follows in pertinent part:

*The Negative Proof*

| CONJUNCTIVE | DISJUNCTIVE |
|---|---|
| To be eligible, you must prove that you have not A, B, and C. | To be eligible, you must prove that you have not A, B, or C. |

With the conjunctive negative proof, you must prove that you did not do all three. With the disjunctive negative proof, what must you prove? If you prove that you did not do one of the three things, are you eligible? Suppose the statute says:

> To be eligible for citizenship, you must prove that you have not (1) been convicted of murder; (2) been convicted of manslaughter; or (3) been convicted of embezzlement.

An applicant proves #3—that he has never been convicted of embezzlement—but fails to prove that he has not been convicted of both murder and manslaughter. Is he eligible? (No.) Is the requirement that he not have done one of these things, or that he have done none? (He must have done none.)

*Id.* at 120. The *Ayden S.* Court thereby held that because the petitioner, DCS, was required to prove that the parents had "failed to manifest, by act or omission, an ability <u>and</u> willingness to personally assume legal and physical custody or financial responsibility" for their children, DCS was required to satisfy a "negative proof" and demonstrate both the parents' inability and unwillingness. *In re Ayden S.*, 2018 WL 2447044, at *7 (quoting Tenn. Code Ann. § 36-1-113(g)(14) (emphasis added)). We respectfully disagree.

It is helpful to take another look at the opening structure of the sentence at issue for this statutory ground:

> <u>A legal parent or guardian has failed to manifest, by act or omission,</u> <u>an ability and willingness to personally assume legal and physical custody</u> <u>or financial responsibility of the child</u>, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14) (emphasis added). The subject of this opening clause is "[a] legal parent or guardian," followed by the verb phrase, "has failed." Therefore, it is clear that the petitioner must prove the legal parent or guardian's failure to do something. This is followed by the infinitive marker, "to," which introduces the base form of the verb, "manifest," to create an infinitive phrase that serves as an object to "has failed," or stated another way, what the parent must have done in order to avoid having failed. *See generally* CHERYL GLENN & LORETTA GRAY, HODGES' HARBRACE HANDBOOK 31 (16th ed. 2007). The infinitive verb phrase ends with the conjunctive construction, "an ability and willingness." The clause then continues with another infinitive verb phrase, "to personally assume legal and physical custody or financial responsibility," and a final prepositional phrase, "of the child[.]"

What then is it that the parent must manifest by act or omission? We determine the answer to this question to be what Garner and Scalia refer to as a conjunctive "basic requirement," defined in pertinent part as follows:

- 19 -

*The Basic Requirement*

| CONJUNCTIVE | DISJUNCTIVE |
|---|---|
| You must do A, B, and C. | You must do A, B, or C. |

With the conjunctive list, all three things are required—while with the disjunctive list, at least one of the three is required, but any one (or more) of the three satisfies the requirement.

GARNER & SCALIA, at 116. We conclude that the petitioner, DCS in this instance, is required to prove the parent's failure (a negative) to satisfy a conjunctive basic requirement: the parent must have "manifest[ed], by act or omission, an ability <u>and</u> willingness." (Emphasis added.) We note that to treat this statutory ground as a negative proof is to require DCS to prove a parent's <u>in</u>ability and <u>un</u>willingness rather than the parent's <u>failure to manifest an ability and willingness</u>. In a separate use of the disjunctive "or," the statute further provides that DCS may prove the parent's failure by demonstrating either that the parent failed "to manifest an ability and willingness to personally assume legal and physical custody . . . of the child" <u>or</u> failed "to manifest an ability and willingness to personally assume . . . financial responsibility of the child." *See* Tenn. Code Ann. § 36-1-113(g)(14).

Moreover, we note the similarity in language between the new statutory ground for termination at issue in subsection -113(g)(14) and the statutory ground for termination of a putative father's parental rights located at Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv), which provides:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

\* \* \*

(iv) <u>The person has failed to manifest an ability and willingness to assume legal and physical custody of the child</u>[.]

(Emphasis added.)

In analyzing the termination of a parent's rights pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv), our Supreme Court has recognized the requirements of ability and willingness as conjunctive. *See In re Bernard T.*, 319 S.W.3d 586, 604-05

(Tenn. 2010) (concluding that the ground was proven where the parent had "manifested a commendable willingness to assume legal custody of all the child" but that he did not "presently have the ability to assume legal and physical custody of any of the children."). *See In re Estate of Tanner*, 295 S.W.3d at 614 ("[T]he language of a statute cannot be considered in a vacuum, but 'should be construed, if practicable, so that its component parts are consistent and reasonable.'" (quoting *Marsh v. Henderson,* 424 S.W.2d 193, 196 (1968))). In *Bernard T.*, our Supreme Court proceeded to affirm the termination of the parent's rights based in part on the ground contained in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv). *Id.*; s*ee also In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *11 (Tenn. Ct. App. Apr. 11, 2016) (affirming the termination of the parent's rights due to his failure to manifest "an *ability* to assume legal and physical custody of the child."). *But see State, Dep't of Children's Servs. v. Williams*, No. W2008-02001-COA-R3-PT, 2009 WL 2226116, at *7 (Tenn. Ct. App. July 28, 2009) (reversing this ground for termination of parental rights when the parent expressed a willingness and desire to parent the child despite the parent's lack of ability to assume custody of the child.).

Upon consideration of the statutory language and the relevant legal authority, we hold that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child. Regarding this first prong in the instant action, the trial court found that DCS had proven by clear and convincing evidence that Father had not manifested an ability and willingness to personally assume legal and physical custody of the Child and financial responsibility for the Child. We agree with the trial court.

Father had incurred several criminal charges during the pendency of the underlying dependency and neglect case, as well as the pending termination action. Since the Child's birth, Father was convicted of two counts of aggravated assault, two counts of driving on a revoked or suspended licensed, one count of unlawful possession of brass knuckles, and one count of arson. Additionally, the trial court found that Father had not maintained safe and stable housing, had not obtained his driver's license to transport the Child, and had not visited with the Child as he should have. Father had failed to provide the case manager with a copy of the lease document pertaining to his home as evidence that the lease was in his name and had intentionally delayed providing his address to the case manager so as to delay a home visit of his residence.

The trial court further relied on Father's performance during an overnight unsupervised visit to demonstrate that Father had not demonstrated an ability and willingness to assume legal and physical custody of the Child. Father enjoyed unsupervised visits for a period of time. When Father was finally awarded an overnight

visit, Father brought a woman he had met via the Internet to accompany him during the visit. Father had never met this individual in person prior to the visit, and she had never met the Child. In addition, this person was later discovered to have a criminal record involving family violence. Father arrived late to pick up the Child and brought the Child back from the visit approximately two hours late. During the unsupervised visit, Father crossed state lines with the Child. The trial court recognized that Father had filed a petition for custody in September 2013 but determined that Father had "failed to manifest, by act or omission, an ability and willingness to personally assume the legal and physical custody of the child."

Furthermore, despite having maintained steady employment until April 2016 and being employed for approximately a month from October to November 2016, Father had failed to pay child support for the Child since April 2015. After losing his job, Father remained unemployed at the time of trial and had no legal, verifiable income by which to support the Child. We recognize that Father has repeatedly verbalized his willingness to assume custody of the Child. However, Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child. In any case, it is clear that at the time of trial, Father did not have the ability to assume custody or financial responsibility for the Child. Father was unemployed with no income to support the Child, had not maintained stable housing, and had been repeatedly incarcerated throughout the Child's life. Based on a thorough review of the record, we determine that the evidence preponderates in favor of the trial court's determination that Father had failed to manifest an ability to personally assume legal and physical custody of and financial responsibility for the Child.

Regarding the second prong, the trial court determined, based on the above evidence, that placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the Child's physical and psychological welfare. Additionally, the trial court recognized that the Child had been placed with the foster parents for four years and had developed a bond with them. In contrast, the trial court found that Father and the Child enjoyed a friendship together instead of a "father-son relationship." This Court recently determined that placing a child with a parent who had knowingly engaged "in repeated criminal conduct that necessitated [the parent's] re-incarceration" would place the child at risk of physical or psychological harm. *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11 (Tenn. Ct. App. Jan. 29, 2018).

Based on the evidence presented, we conclude that DCS has proven by clear and convincing evidence that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child and that placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. Accordingly, and considering our

affirmance of the other two statutory grounds at issue, we affirm the trial court's findings regarding the existence of statutory grounds for termination.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (2017) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)   Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)   Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)   Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)   Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's,

rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The trial court made the following findings of fact concerning the best interest analysis in pertinent part:

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that [Mother] and [Father] have failed to make a lasting adjustment of their circumstances to make it safe and in the child's best interest to be placed in their care.

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that [Mother] and [Father] have failed to make a lasting

- 25 -

adjustment of their circumstances after the state has made reasonable efforts to help them for such duration of time that lasting adjustment does not reasonably appear possible. Specifically, the child has been in foster care for four (4) years. . . . [Father] has failed to maintain stability and has incurred numerous criminal charges and violations during the pendency of the case. [Father] is unemployed and relies on his family members to support him.

* * *

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as a change of caretakers and home would have a highly negative effect on the child. The child has been placed in a loving, pre-adoptive home for four (4) years. The child is thriving in that home and is bonded to the foster family. This family is the only family that the child really knows. [Foster Parents] wish to adopt him, should he become available for adoption.

The Court finds, pursuant to T.C.A[.] § 36-1-113(i), that it is in the best interest of the child for termination to be granted, because [Father] has not paid child support consistently. [Father] has not made a child support payment since April 2015. . . .

(Paragraph numbering omitted.) We agree with the trial court's conclusion that termination of Father's parental rights is in the best interest of the Child.

Relevant to Tennessee Code Annotated § 36-1-113(i)(1) and (2), the trial court found that Father had failed to make a lasting adjustment in his circumstances that would make it safe and in the Child's best interest to be placed in his care despite reasonable efforts made by DCS. After Father had established paternity, DCS averred that Father's home was not safe for the Child. Despite the Child's having been in foster care for four years, the trial court found that no evidence existed "that direct[ed] the Court to any point in time where [Father] was truly able to physically take custody of this child." The trial court found that Father had failed to maintain stability to demonstrate his ability to care for the Child and had incurred several criminal convictions throughout the time the Child was in foster care. The trial court further found that Father remained unemployed and that he relied on family members to support him. Father admitted during trial that his father and Paternal Grandmother paid the bills associated with his current home.

As to factor (3), although Father had maintained visitation with the Child, the trial court found that the visitation had not been consistent. Father had received unsupervised

- 26 -

visitation with the Child for a period of time before he was allowed an overnight visit. However, the trial court found that throughout the time Father was receiving unsupervised visitation, his visits were inconsistent and that Father failed to maintain adequate contact with DCS. Additionally, when Father received his first and only overnight visit, he arrived to pick up the Child for the visit two hours late, took the Child across state lines, returned the Child to the foster home approximately two hours late, drove the Child during the visit without a valid driver's license, and was accompanied on a portion of the visit by an unapproved female whom he had met through social media a few days earlier. Father's unsupervised visitation was suspended at that time. DCS and Father developed a plan to allow Father to move forward toward unsupervised visitation again by attending visits, being on time for the visits, attending the visits alone, and caring for the Child during the visits. The court found, however, that Father was inconsistent in attending those visits. Testimony established that Father received only supervised visitation after the overnight visit and never progressed to unsupervised visitation.

Concerning factor (4), the trial court found that Father and the Child "have a friendship with one another, not a father-son relationship." Father had visited with the Child somewhat frequently. However, the foster mother testified that although the Child enjoyed playing with Father, Father would remain on his cellular telephone for much of his visits and that she would have preferred to have seen more bonding between Father and the Child. Ms. Holland also testified that Father was sometimes on his cellular telephone "a little too much."

Pursuant to factor (5), the trial court determined that the Child had developed a close bond with the foster family, who wished to adopt him. The Child had been placed in the foster parents' home since the Child was four days old and had remained in their care for four years. The trial court determined that the foster family was the only family the Child had ever known and that removing the Child from the foster family's home and changing his caretakers would have a "highly negative effect" on the Child.

In regard to factor (7), although no evidence was presented regarding any alcohol or substance abuse, Father had continued to participate in criminal activity during the pendency of the case, with his criminal activity spanning from July 2013 through April 2016. Father was convicted of two counts of aggravated assault, two counts of driving on a revoked or suspended licensed, one count of unlawful possession of brass knuckles, and one count of arson. Father's criminal history appears to have begun after the Child was born. The trial court found that Paternal Grandmother had been indicated by DCS for sexual exploitation of a minor and that Paternal Grandmother possessed a key to Father's home, which provided her with unfettered access to his home.

Pursuant to factor (9), the trial court found that Father had not paid child support consistently and had not paid any child support for the Child since April 2015. Father testified that he sometimes brought items for the Child with him to visits with the Child. However, according to Ms. Holland, Father owed an arrearage balance at the time of trial of $4,000.00.

The trial court did not address whether Father's mental or emotional status would be detrimental to the Child or prevent him from effectively parenting the Child pursuant to factor (8). In Father's mental health assessment, the evaluator opined that Father did not present signs of a mental health problem or personality disorder. However, due to Father's responses in testing, the evaluator recommended that he complete anger management classes. The evaluator opined that if Father addressed his potential issue with anger management, received training with child care, and had a support system to assist him with printed material, no obvious reason existed as to why Father could not be an adequate father to the Child. Father completed anger management classes and parenting classes. This factor weighs in favor of Father.

Nonetheless, the evidence presented regarding the statutory factors as a whole weighs in favor of termination of Father's parental rights as in the best interest of the Child. Based on our review of the evidence in light of the statutory factors, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. We therefore affirm the trial court's termination of Father's parental rights.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Father's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, William K.

_____
THOMAS R. FRIERSON, II, JUDGE